## Gillis v. Commonwealth.

(Decided June 22, 1926.)

### Appeal from Rockcastle Circuit Court.

1. Criminal Law.—Failure to instruct as directed by Supreme Court on former appeal held error; former opinion being law of case.
2. Criminal Law.—Where testimony on second trial was substantially the same as on first, admission of deceased's statements, which Supreme Court held incompetent on former appeal was error
3. Criminal Law.—A former opinion on second trial, where facts are substantially the same, is the law of the case.
4. Criminal Law.—Where Commonwealth witness admitted having conversation with others just prior to shooting affray, excluding questions on cross-examination as to conversation bearing on his motive held error.
5. Witnesses.—Refusal to permit full cross-examination of Commonwealth witness as to events immediately preceding, coincident with, and immediately following the homicide held error.
6. Criminal Law.—Permitting cross-examination of defense witness as to intimate relations with married woman, notwithstanding condemnation of such testimony on former appeal, held error.

C. C. WILLIAMS and S. D. LEWIS for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Reversing.

This is the second appeal of this case, the former opinion of the court appearing in 202 Ky. at page 821. Two previous appeals have been prosecuted to this court, in Foure v. Commonwealth, the apellant in those cases being jointly indicted with this appellant, the opinion on the first appeal appearing in 205 Ky. at page 62, and that upon the second appeal not yet being published. Reference to those opinions will disclose the facts of the transaction out of which these prosecutions have arisen.

Upon a second trial appellant, Bill Gillis, was found guilty of manslaughter and sentenced to serve 21 years in the penitentiary. This appeal is prosecuted from that judgment.

Upon the former appeal of this case, by the opinion rendered, this court directed that upon another trial, at the close of the first paragraph of instruction No. 4, the instruction on self-defense, the trial court would add these words: "If defendant was excusable for shooting as above defined, it is not material that the bullet struck a man not intended when the shot was fired." Upon the last trial hereof, resulting in the judgment from which this appeal is prosecuted, that mandate of this court was overlooked by the trial court and those words again were omitted from the instruction given. The former opinion is the law of the case, and the trial court erred in failing to instruct as directed.

In the former opinion this court considered at length the testimony of the witnesses as to the statements made by deceased, Chester Mullins, after he was shot, and concluded that nothing said by him before he was carried to his home and before he had requested that one of the ministers present pray for him were admissible as his dying declaration for the reason, as stated in the opinion, that none of his statements made prior to that time appeared to have been made under that sense of impending death and when all hope of recovery had been abandoned by him so as to render them competent as a dying declaration. The evidence upon the second trial was in all essential particulars the same as that upon the former. Over appellant's objection a number of witnesses upon the second trial were permitted to testify fully as to the statements made by deceased to them before he had been carried to his home and before he requested that the minister pray for him. After permitting all of the witnesses introduced by the Commonwealth to testify indiscriminately as to the statements made by Chester Mullins after he was shot, both before he was carried to his home and before he had requested that the minister pray for him, as well as afterwards, at the conclusion of the evidence for the Commonwealth, upon the second trial, the court withdrew from the jury all of the testimony as to his statements after he had been carried home, but left in evidence before the jury and permitted them to consider all of his statements made to witnesses who first reached him after the difficulty while he was

yet at the scene of the difficulty and before he had been carried home. Under this court's uniformly applied rule, that a former opinion upon a second trial where the facts are substantially the same is the law of the case, the trial court clearly was in error as to this.

This homicide occurred in the town of Livingston, Kentucky, at or near the intersection of Gauley road and High street. Appellant, who was the town marshal of that town, and J. M. Foure, a blind man, who was the police judge of the town, and Jim Roberts, together were proceeding along Gauley road approaching its intersection with High street and going in the direction of the main part of the town of Livingston. Deceased, Chester Mullins, and John Poynter were together, and the two parties came in contact near the intersection of those two streets. The testimony for the Commonwealth from its witness, John Poynter, tended to establish that they were proceeding along the Gauley road in the same direction that appellant and Foure and Roberts were and that the latter three had secreted themselves by the side of a storehouse situated at the intersection of the two streets and opened fire upon them as they came up the road. The testimony for defendants tended to establish that Poynter and Mullins approached the intersection of the two streets from High street and after having passed them that Mullins and Poynter began the difficulty by firing upon them. The case for the Commonwealth is made largely if not altogether by the testimony of the witness, Poynter. But few records have been submitted to this court for review wherein the testimony of a witness appears to be more thoroughly discredited than does that of Poynter in this record. Some twenty or thirty minutes before the fusillade of shots which were fired at or near the intersection of Gauley road and High street, some one or more of which struck and killed Chester Mullins, there had been some shooting near there at a point on Gauley road near the old bridge. The testimony for the Commonwealth from the witness, Poynter, tended to establish that those shots were fired at him, and on his direct examination he testified that when they were fired at him he took refuge behind a rock wall near the bridge and stayed there for several minutes, following which he went to the home of Chester Mullins and induced him to go home with him. When questioned that witness admitted that while he was waiting about the old bridge after that first shooting he saw and talked with

John Kelly and Jim Sandbrook. The ground for his contradiction by those two witnesses was laid by asking him if he did not say to Kelly at that time on the bridge: "I am looking for Matt Foure; I intend to kill the damn s— of b—; I hate to kill him at his own home;" and by asking him if he did not say to the witness, Sandbrook: "I am laying for Matt Foure, the damn blind s— of a b—," and he denied having made those statements to either of the witnesses. He admitted having had conversation with each of them. He was then asked to state what he did say to them, and in each instance the trial court sustained the Commonwealth's objection. In this we think the trial court clearly was in error, as these conversations were had within a few moments before the difficulty in which Chester Mullins lost his life, and the defense was clearly entitled to cross-examine the witness, Poynter, fully to bring out any evidence shedding light on his motive and state of feelings as bearing directly on the question, which of the two contending forces precipitated the encounter which resulted in the death of Mullins by firing first. While that witness was being cross-examined relative to the part played by him in both the first shooting and in that later when Mullins was killed, objection by the Commonwealth to a number of questions asked him were sustained by the trial court. For instance, after having testified that in the first shooting five shots were fired at him, on cross-examination he was asked: "While the shooting was going on what were you doing?" The trial court sustained an objection to that question. He was then asked: "After these shots were fired and you got up from behind the rock wall, what did you do then?" to which the court sustained an objection. Cross-examining him with reference to the shooting where Mullins was killed, he was asked: "At the time that shot was fired (the first shot of that difficulty) your back and Chester's back were turned toward Gillis, is that right?" to which an objection was sustained. Cross-examining him as to his statement that appellant, Gillis, had shot both at him and at Mullins, he was asked: "Could you tell he shot one time at you and one time at Chester;" and further: "Could you tell each time he shot at you and each time he shot at Chester?" and objections were sustained to both questions. According to the position in which that witness placed the participants in the difficulty when it occurred, Gillis and Foure and Poynter were nearer the intersec-

tion of Gauley road and High street than he and Mullins were. He had stated that when the shooting was over he left Gauley road and proceeded along High street for some distance. He was asked on cross-examination: "In order to go that way you had to pass Gillis; how close did you go to him?" to which question the trial court sustained an objection. He had stated that Foure, the blind man, had taken part in the shooting that resulted in Mullins' death and that in leaving the scene of the shooting he was running and dropped his pistol. In cross-examining him as to why he was running when he left the scene of the difficulty, he was asked: "Did you think Matt would shoot you again?" and: "Did you think Foure was going to shoot at you any more?" The trial court sustained objections to both questions. All of those questions related to the events immediately preceding and coincident with and immediately following the main transaction which is the subject of this prosecution, and it seems to this court that the trial court should have permitted him to be cross-examined fully with reference to all of them.

While appellant's co-defendant, J. M. Foure, was being cross-examined, his relations with a Mrs. Martin were inquired into, over appellant's objection, to a greater length than was proper. He was asked: "Is it not a fact that you have been going to see her for several months before this killing?" and: "Did you not often go there when Martin was not at home?" and: "Why did you take her down to London?" and: "Were you on a courting trip when you went to London?" Objections were sustained to the last two questions, but overruled as to the others. He was also asked: "I will ask you this question, if it is not a fact that he (John Poynter) came here to Mt. Vernon to get a warrant for you and this woman and you were here together?" The court overruled an objection to that question. Appellant, Foure, was not on trial at all. The truth or falsity of the rumors of his undue intimacy with Mrs. Martin was not in issue. That character of testimony was expressly condemned by this court in its previous opinion in the Foure case. The questions to which the objections were sustained should not have been asked, and those indicated and questions of similar import, to which objections were overruled, were erroneously permitted to be

asked and required to be answered and will be eliminated upon another trial hereof.

In view of the fact that another trial will have to be had the question presented as to the verdict being flagrantly against the evidence will not be considered and passed upon.

For the reasons indicated the judgment is reversed and this cause remanded, with direction that appellant be granted a new trial, and for further proceedings con-sistent with this opinion.